## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### CIVIL CASE NO. 3:07cv362

| | |
|---|---|
| In re: | ) |
| | ) |
| **Martha Medlock Gallagher,** | ) |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| **SUSAN F. KEEVER,** | ) |
| | ) |
| Appellee, | ) |
| | ) |
| vs. | ) **MEMORANDUM OF** |
| | ) **DECISION** |
| **MARTHA MEDLOCK GALLAGHER,** | ) |
| | ) |
| Appellant. | ) |
| _____ | ) |

**THIS MATTER** is before the Court on the Notice of Appeal [Doc. 1],

filed by the Appellant Martha Medlock Gallagher ("Gallagher")[1], from the

Order of United States Bankruptcy Court Judge J. Craig Whitley entered

August 24, 2007.  [Doc. 42, Keever v. Gallagher, 3:02-ap-3243 ("Bky.

_____

[1]After the filing of the adversary proceeding below, Appellant Martha Medlock
Gallagher married the ex-husband of the Appellee Susan Keever ("Keever").  Although
the Appellant now goes by the last name of Keever, in order to avoid confusion, the
Court will refer to the Appellant by her former name, Gallagher, throughout this opinion.

Doc.")].  For the reasons stated herein, the Order of the Bankruptcy Court is **AFFIRMED IN PART** and **REVERSED IN PART**, and this matter is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY

Gallagher filed a voluntary Chapter 7 petition in the Bankruptcy Court on September 26, 2002.  [Voluntary Petition, Doc. 1, In re: Gallagher, 3:02-bk-33036].  At the time of her filing, Gallagher was a defendant in a case ("State Court Action") brought in Gaston County Superior Court by Keever alleging alienation of affections and criminal conversation by Gallagher with Keever's husband.  [Schedule F to Voluntary Petition, Doc. 2, In re: Gallagher, 3:02-bk-33036].  On December 26, 2002, Keever filed an adversary proceeding in the Bankruptcy Court, asserting the same tort claims as those raised in the State Court Action.  [Complaint Objecting to Dischargeability of Indebtedness, Bky. Doc. 1].  Keever also requested that the resulting liability be declared nondischargeable as a "willful and malicious injury" under 11 U.S.C. §523(a)(6).  [Id.].

On June 29, 2004, the parties entered into a Consent Order [Bky. Doc. 14], in which the parties agreed that the two actions presented similar

2

issues and that the state tort claims should be tried before a jury in Gaston County Superior Court.  The parties further agreed that upon entry of any monetary judgment for Keever in the State Court Action, the parties would return to the Bankruptcy Court for a determination of whether such monetary obligation was dischargeable.  [Id.].

Following trial in the State Court Action, the jury returned a verdict finding Gallagher liable for both alienation of affections and criminal conversation.  [Judgment of Gaston County Superior Court, Bky. Doc. 16]. The Judgment states that the jury awarded Keever "$50,000 for alienation of affections or criminal conversation or both" and $75,000 in punitive damages.  [Id.].  Thereafter, Keever moved for summary judgment in the adversary proceeding, arguing that the jury's verdict in the State Court Action established that Gallagher had injured Keever in a "willful and malicious" manner so as to render the debt nondischargeable under 11 U.S.C. §523(a)(6).  [Motion for Summary Judgment, Bky. Doc. 19]. Following a hearing, the Bankruptcy Court concluded that the doctrine of collateral estoppel barred relitigation of whether Gallagher's actions constituted a "willful and malicious injury" and thus granted Keever's motion for summary judgment.  [Order, Bky. Doc. 21 at 10, 11].  Gallagher

appealed to this Court, arguing that the doctrine of collateral estoppel did not apply because the jury in the State Court Action never found that Gallagher willfully and maliciously intended injury to Keever or to Keever's protected marital relationship. [Notice of Appeal, Doc. 1, Civil Action No. 3:06-cv-108]. Relying upon Kawaauhau v. Geiger, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) and In re Duncan, 448 F.3d 725 (4th Cir. 2006), this Court reversed, finding that the judgment in the State Court Action did not support application of the doctrine of collateral estoppel in this case because "neither the alienation of affections claim nor the punitive damages award in the State Court Action specifically involved and clearly decided the issue of whether Gallagher maliciously intended to injure the Keever's [sic] marital relationship." [Order, Doc. 8, Civil Action No. 3:06-cv-108, at 7, 8]. Accordingly, this Court remanded this matter to the Bankruptcy Court for a determination of "whether Gallagher 'willfully and maliciously' injured the marital relationship" so as to render the debt nondischargeable under 11 U.S.C. §523(a)(6). [Id. at 7].

Upon remand, the Bankruptcy Court held a trial on the dischargeability issue. Gallagher and Keever were the only witnesses who testified at this proceeding. On August 24, 2007, the Bankruptcy Court

4

entered an Order, finding that Gallagher had "committed a willful and malicious injury directed at Keever," that Gallagher had "intended to harm the marital relationship of Keever," and that "Gallagher's conduct constitutes a willful and malicious injury to Keever and her marital relationship as contemplated by 11 USC §523(a)(6)." [Bky. Doc. 42 at 4]. Accordingly, the Bankruptcy Court concluded that the indebtedness resulting from the State Court Judgment is nondischargeable. [Id.]. This appeal followed.

## STANDARD OF REVIEW

The decision of the Bankruptcy Court is reviewed by a two-step process. Reversal of the findings of fact of the Bankruptcy Court may occur only where such findings are clearly erroneous. See Educational Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 398 (4th Cir. 2005). The Bankruptcy Court's legal conclusions, however, are subject to a de novo standard of review. See Schlossberg v. Barney, 380 F.3d 174, 178 (4th Cir. 2004). "Findings of fact are clearly erroneous 'when, although there is evidence to support [them], the reviewing court on the entire evidence is left with the definite and firm conviction that a

mistake has been committed.'" McGahren v. First Citizens Bank & Trust

Co. (In re Weiss), 111 F.3d 1159, 1166 (4th Cir.) (quoting Green v. Staples

(In re Green), 934 F.2d 568, 570 (4th Cir. 1991)), cert. denied, 522 U.S.

950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997).  As stated by the Supreme

Court:

> If the [lower court's] account of the evidence is
> plausible in light of the record viewed in its entirety,
> the [appellate court] may not reverse it even though
> convinced that had it been sitting as the trier of fact,
> it would have weighed the evidence differently.
> Where there are two permissible views of the
> evidence, the factfinder's choice between them
> cannot be clearly erroneous.

Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511,

84 L.Ed.2d 518 (1985).  Additionally, due regard must be given to the

Bankruptcy Court's assessment of the credibility of the witnesses.

Educational Credit Mgmt. Corp. v. Gouge, 320 B.R. 582, 583 (W.D.N.C.

2005).  Thus, "absent extraordinary circumstances, an appellate court

should not disturb a factfinder's credibility determinations."  In re

Environmental Aspecs, Inc., 235 B.R. 379, 384 (E.D.N.C. 1999).

## FACTUAL BACKGROUND

Gallagher first met Keever's husband, Ricky Keever ("Ricky"), in 1997, when he and Gallagher became co-workers at Ansco. [Trial Transcript dated July 23, 2007 ("Transcript"), Bky. Doc. 48 at 5]. Gallagher was introduced to Susan Keever in 1997 at a company Christmas party. [Id. at 42-43]. Gallagher and Ricky had daily interactions in the course and scope of their employment. [Id. at 12]. In 2000, Ricky began leaving notes on Gallagher's desk, expressing his interest in her. [Id. at 17]. In September 2000, he invited Gallagher to lunch at a nearby park, where they had sexual relations. [Id. at 12, 19]. Gallagher knew that Ricky was married at the time, although he had told her that he had had an affair in the past and that his relationship with Keever was "on rocky grounds." [Id. at 16]. Gallagher was also married at the time. [Id. at 15].

Gallagher quit her job at Ansco in October 2000. [Id. at 23]. Before she quit, she gave Ricky a cell phone. [Id. at 38, 44]. She testified that between September 2000 and March 2001, Ricky repeatedly contacted her but that she "tried to stay away and not contact him back." [Id.]. On March 31, 2001, Ricky contacted Gallagher and told her that he and Keever were separating. [Id. at 26]. Ricky invited Gallagher over to a friend's house for

a beer and she accepted.  [Id. at 27].  They ended up spending the night together and having sexual relations. [Id. at 31].

The following morning, Keever called Gallagher and asked her to come to her house to discuss the matter.  [Id. at 27-28].  Gallagher and Keever met for about an hour.  During that meeting, Keever told Gallagher that she and Ricky had been together for eighteen years, that they had an eight-year-old son together, and that she intended to keep her family intact. [Id. at 56-57].  She also told Gallagher that she loved Ricky, that she believed that Ricky loved her, and that they were going to remain together. [Id. at 57, 59].  Keever warned Gallagher to leave her family alone.  [Id. at 57].  Gallagher assured Keever that she would end her "friendship" with Ricky and never speak to him again.  [Id. at 32, 57].  Notwithstanding her statements to Gallagher, Keever ordered Ricky to leave the house for a few days after the March 31, 2001 incident.  [Id. at 57].  Within a week, however, they reconciled, and Ricky returned to live with Keever.  [Id. at 58].

On May 6, 2001, Keever found the cell phone Gallagher had given Ricky hidden in one of Ricky's boots in his truck.  [Id. at 60].  Keever testified as follows:

Q.      And what did you do when you found that phone?

A.      I looked at the numbers that had been called and when they had been called.

Q.      And what did you find?

A.      I found that he had called her that evening about 6:45.

Q.      Was it just one time that you found her number?

A.      Oh, no, sir.  That phone was full of her number and his number and, as far as I can remember, and I can remember pretty good, I don't remember another number being on there except their two numbers.  Her home phone and her cell phone was on this cell phone, that it had been called.

Q.      And how many instances of her number did you find?

A.      I found them all the way back, way back in March.  I found dates all the way back.

Q.      How many between the time, though, that you had the conversation with her on April 1 and the May 6th date?

A.      Probably twenty-five to thirty calls, at least.

[Transcript, Bky. Doc. 48 at 61-62].  Keever further testified that she

pressed redial and reached Gallagher's answering machine.  [Id. at 62].

Keever and her husband separated shortly thereafter she discovered the cell phone in Ricky's truck, and they subsequently divorced. [Id. at 41, 65]. Gallagher is now married to Ricky Keever. [Id. at 10].

Gallagher denied that she had any contact with Ricky after her meeting with Keever until after Keever and Ricky separated in May, 2001. [Id. at 40]. She specifically denied having regular phone contact with him during that time. [Id. at 37, 42].

Having heard the sworn testimony of both parties, the Bankruptcy Court made the following findings of fact:

1.  Keever is a citizen and resident of Gaston County, North Carolina. She was married to Ricky Keever on September 19, 1986.

2.  In 1997, Keever was living together with her husband Ricky, their own son Ben, and Ricky's son by a prior marriage.

3.  For her part, Gallagher was also a citizen and resident of Gaston County, North Carolina during 1997, and she was married to one Joseph Gallagher and lived together with him and the couple's two teenage daughters.

4.  During that year, 1997, Gallagher began employment at the Ansco Company where Plaintiff's husband worked; and these parties first met each other during that year.

5.  Gallagher testified, and the Court so finds, that during the following years from 1997 into 2000, Gallagher had daily

dealings with Keever's husband in the scope and course of her employment.

6. During that time period (1997-2000), the relationship between Gallagher and Keever's husband had progressed to the point where during the month of September, 2000, Gallagher and Keever's husband went to a park in Mecklenburg County during lunch one weekday and had sexual relations there.

7. In October, 2000, Gallagher ceased her employment at Ansco, but her relationship with Keever's husband continued such that during the late evening hours of March 31, 2001, Keever's husband phoned Gallagher to come pick him up at a friend's house, which she did. Gallagher then spent that night with Keever's husband and had sexual relations with him.

8. Although Keever had been led to believe that her husband was drinking and sleeping-over at a male friend's home the night of March 31, 2001, she discovered that same night that Gallagher had picked up her husband instead. So the next day, Sunday, April 1, 2001, Keever phoned Gallagher and invited her to her (Keever's) house to discuss the matter.

9. On April 1, 2001, Gallagher met with Keever and spent about an hour in Keever's home. During that meeting, Keever advised Gallagher that she believed she (Keever) had a loving relationship with her husband and that they enjoyed a close family relationship. Further, Keever advised Gallagher that Gallagher's actions with her (Keever's) husband were interfering with her marriage. Finally, Keever warned Gallagher to leave her husband alone.

10. Gallagher testified, and the Court so finds, that at that meeting with Keever, Gallagher told Keever that she

understood her (Keever's) concerns and further assured her that she (Gallagher) would have no further contact with Keever's husband.

11. Despite such assurances from Gallagher, she (Gallagher) nevertheless continued her relationship with Keever's husband, which continued relationship was thereafter discovered by Keever on May 6, 2001 when she found a cell phone given by Gallagher to her (Keever's) husband hidden in one of his boots in his truck. The phone contained a record of recent calls, both incoming and outgoing, involving both Gallagher's home phone number and her cell phone number.

12. Keever testified, and the Court so finds, that the record of phone calls found by Keever numbered over twenty and were calls made after the April 1, 2001 meeting of the parties at the Keever home.

13. Gallagher testified, and the Court so finds, that she gave the aforementioned cell phone to Mr. Keever.

14. The Court further finds that Gallagher gave the cell phone to Mr. Keever in furtherance of her relationship with him, and that the phone was in fact used for that purpose.

15. Following discovery of the cell phone containing the record of calls made and received, Keever separated from her husband and subsequently divorced.

16. Gallagher testified, and the Court so finds, that she herself is now married to Keever's former husband.

[Order Declaring Debt to Be Non-Dischargeable, Bky. Doc. 42 at 3-4].

Based upon these findings of fact, the Bankruptcy Court made the following conclusions of law:

1.    The Court has both subject matter jurisdiction and jurisdiction over these parties.

2.    All parties have been given due notice and an opportunity to be heard.

3.    At all relevant times related to the conduct of Gallagher and her relationship to Keever's husband, Keever was lawfully married to her husband and enjoyed, under the laws of the State of North Carolina, a protected right and interest in that marital relationship, including but not limited to, the right to exclusive companionship and sexual relationship.

4.    Gallagher knew at all time of Keever's marriage and she is charged with knowledge of Keever's protected status in the marital relationship with her spouse.

5.    Additionally, at their April 1, 2001 meeting, Keever clearly advised Gallagher that she valued her marital relationship, and further advised Gallagher that her conduct was, in essence, a trespass upon that marital relationship. She even warned Gallagher to leave her husband alone.

6.    Over Keever's protest and despite her own assurances that she would not do so, Gallagher continued her relationship with Keever's husband; and in so doing she committed a willful and malicious injury directed at Keever and intended to harm the marital relationship of Keever.

7.    Gallagher's conduct constitutes a willful and malicious injury to Keever and her marital relationship as contemplated by 11 U.S.C. §523(a)(6) as explained in Geiger and Duncan, and the indebtedness resulting from the state court judgment should therefore be declared non-dischargeable.

[Id. at 4].


# DISCUSSION

Section 523(a)(6) of the Bankruptcy Code provides that a debt is not dischargeable if it arises from a "willful and malicious injury by the debtor to another entity or to the property of another."  11 U.S.C. §523(a)(6).  The dischargeability exceptions set forth in §523(a)(6) must be proved by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).  The Supreme Court has held that §523(a)(6) applies only to "acts done with *the actual intent to cause injury*." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (emphasis added).  As the Fourth Circuit recently explained:

> Section 523(a)(6) is not satisfied by negligent, grossly negligent or reckless conduct.  Moreover, the mere fact that a debtor engaged in an intentional act does not necessarily mean that he acted willfully and maliciously for purposes of § 523(a)(6).  Nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.

Duncan v. Duncan (In re Duncan), 448 F.3d 725, 729 (4th Cir. 2006) (citations omitted).  "The test, then, is whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective motive to

cause harm." Parsons v. Parks (In re Parks), 91 Fed. Appx. 817, 819 (4th Cir. 2003) (quoting In re Miller, 156 F.3d 598, 603 (5th Cir. 1998)). The debtor's state of mind in this regard may be established by circumstantial evidence. See KMK Factoring, L.L.C. v. McKnew (In re McKnew), 270 B.R. 593, 640 (Bankr. E.D. Va. 2001).

The Court previously remanded this matter to the Bankruptcy Court for the purpose of determining "whether Gallagher 'willfully and maliciously' injured [Keever's] *marital relationship*." [Order, Doc. 8, Civil Action No. 3:06-cv-108, at 7, 8] (emphasis added). At the outset, the court notes the difficulty raised by the issue of whether an injury to a *marital relationship* constitutes an injury "to another entity or to the property of another" within the meaning of §523(a)(6). Neither party, however, raised this issue in the Bankruptcy Court or on appeal to this Court, and thus this issue has been waived. See In re Lane, 991 F.2d 105, 106 (4th Cir. 1993). In any event, this legal ambiguity appears to have been rendered moot by the Bankruptcy Court's determination that Gallagher's conduct resulted in "a willful and malicious injury to *Keever and* her marital relationship." [Bky. Doc. 42 at 7] (emphasis added). It is this determination by the Bankruptcy Court that the Court will now review.

The evidence presented at trial established that Gallagher and Keever's husband met in 1997 when they became co-workers at Ansco. [Transcript, Bky. Doc. 48 at 5]. They had interaction with each other on a daily basis at work. [Id. at 12]. Gallagher testified that Keever's husband began to leave notes on her desk expressing his interest in her. [Id. at 17]. In September 2000, Gallagher went with Keever's husband to a park during their lunch hour and had sexual relations. [Id. at 12, 19]. Gallagher gave Keever's husband a cell phone [Id. 38, 44], which he used to contact her. They had sexual relations again in March 2001, after Keever's husband called Gallagher from a friend's house and invited her over for a beer. [Id. at 27, 31]. While Gallagher denied having sexual relations with Keever's husband between September 2000 and March 2001, she admitted that he repeatedly contacted her during this time. [Id. at 23]. Further, as established by the testimony of Susan Keever regarding the cell phone that she discovered hidden in her husband's truck, Gallagher and Keever's husband remained in contact with each other even after Gallagher assured Keever that she would no longer speak to him. [Id. at 61-62]. While Gallagher denied having any contact with Keever's husband between the time of her meeting with Keever on April 1, 2001 and Keever's

discovery of the cell phone on May 6, 2001, Gallagher's testimony is directly contradicted by Keever's testimony regarding the log of calls on the cell phone, and the Bankruptcy Court obviously considered Gallagher's testimony on this issue to be unpersuasive. The Bankruptcy Court's credibility determination in this regard is entitled to due deference. See Educational Credit Mgmt. Corp., 320 B.R. at 583; In re Environmental Aspecs, 235 B.R. at 384.

Gallagher contends that the Bankruptcy Court "erred ... in concluding that Gallagher's conduct constitutes a willful and malicious injury to Keever and her marital relationship as contemplated by 11 U.S.C. §523(a)(6)" because there is no evidence in the record that she intended to harm Keever or her marital relationship. [Appellant's Brief, Doc. 2 at 5]. At trial, Gallagher testified that she had no such intent. [Transcript, Bky. Doc. 48 at 77].

The evidence presented at trial established that Gallagher knew from the outset of her relationship with Keever's husband that he was married and living with his wife. [Transcript, Bky. Doc. 48 at 16]. Gallagher had met Keever in 1997 when Gallagher and Keever's husband began working together. [Id. at 42-43]. Although Keever's husband had told Gallagher

that his relationship with Keever was "on rocky grounds" [id.], Keever

herself made it abundantly clear to Gallagher on April 1, 2001 that she and

her husband had been married for eighteen years; that they had a child

together; that she loved her husband and that he loved her; and that she

wanted Gallagher to leave her family alone.  [Id. at 56, 57, 59].  Both

parties testified that Gallagher assured Keever that she would end her

relationship with Keever's husband.  [Id. at 32, 59].  Despite these

assurances, however, Gallagher continued her relationship with Keever's

husband, as evidenced by the record of calls on the cell phone, which

Gallagher had given to Keever's husband and which Keever found hidden

in her husband's truck.  [Id. at 61-62].  As a result, Keever and her

husband separated and divorced, after which Gallagher married Keever's

former husband.  [Id. at 10, 41, 65].

Upon review of the record, there is abundant evidence to support a

finding that Gallagher intentionally engaged in an adulterous affair with

Keever's husband.  The evidence establishes that Gallagher and Keever's

husband had sexual relations twice during the Keevers' marriage: in

September 2000 and March 2001.  While Gallagher knew that the Keevers

were married, the evidence shows that she believed the Keever marriage

to be "on rocky ground" at the time that she engaged in sexual relations with Keever's husband. As such, there is no evidence that Gallagher participated in the adulterous acts with the "substantial certainty that harm could result" to Susan Keever. Moreover, there is nothing in the record to support a finding that Gallagher engaged in sex with Mr. Keever with the subjective motive to injure Susan Keever. The entire record is consistent with Gallagher's own testimony when she stated that "I had no intent toward Susan. I was only thinking of me, honestly, . . . I had sex and that's really all I thought about at that time." [Id. at 77]. Although Gallagher was informed by Keever at their April 1, 2001 meeting that Keever intended to stay married to her husband, there is no proof in the record that Gallagher and Ricky Keever engaged in sexual relations *after* Gallagher was so informed. As such, there is no support in the record for a finding that Gallagher committed criminal conversation with Keever's husband with the intent to willfully and maliciously injure Keever and her marital relationship. Given the lack of proof of a "willful and malicious" injury to Keever as a result of Gallagher's criminal conversation with Keever's husband, the portion of the State Court Judgment that is attributable to the criminal

conversation claim cannot be deemed a nondischargeable debt under §523(a)(6).

The record supports a finding that Gallagher intentionally continued her relationship with Keever's husband, at least in a non-sexual manner, after her meeting with Keever on April 1, 2001. The evidence regarding Gallagher's specific intent to "willfully and maliciously" injure Keever by this conduct, however, is rather weak. Gallagher denied having any contact with Keever's husband following the April 1, 2001 encounter with Keever. The only evidence presented to the contrary came from Keever, who testified about finding the cell phone, which Gallagher admittedly had given to Keever's husband, hidden in her husband's truck. On this issue, Keever's testimony is far from clear:

> Q.     And what did you do when you found that phone?
>
> A.     I looked at the numbers that had been called and when they had been called.
>
> Q.     And what did you find?
>
> A.     I found that *he had called her* that evening about 6:45.
>
> Q.     Was it just one time that you found her number?

A.     Oh, no, sir.  That phone was *full of her number and his number* and, as far as I can remember, and I can remember pretty good, I don't remember another number being on there *except their two numbers.  Her home phone and her cell phone was on this cell phone, that it had been called.*

Q.     And how many instances of her number did you find?

A.     I found them all the way back, way back in March.  I found dates all the way back.

Q.     How many between the time, though, that you had the conversation with her on April 1 and the May 6th date?

A.     Probably twenty-five to thirty calls, at least.

[Transcript, Bky. Doc. 48 at 61-62] (emphasis added).  While Keever's testimony clearly establishes that there were twenty-five to thirty calls logged on the cell phone, it is not clear from her testimony that any of these phone calls were actually made by Gallagher to Keever.  Although later in her testimony, Keever commented that by looking at the phone, "I knew he had called her everyday and I knew *she had called him back* almost everyday," [id. at 73] (emphasis added), Keever does not explain the factual basis for such knowledge – in fact, she never testified that she saw a log of calls *from* Gallagher *to* her husband on the cell phone.

If the cell phone revealed only a number of one-way calls from Keever's husband to Gallagher, a reasonable inference could be drawn that Gallagher was not actively attempting to continue her relationship with Keever's husband and thus was not acting with the requisite intent to injure Keever. It is possible that Keever's husband was repeatedly attempting to contact Gallagher and continue their relationship and that Gallagher rebuffed those advances. There certainly is no evidence of how long these phone calls lasted, or even if they were answered by Gallagher.

It also could be reasonably inferred from the evidence presented, however, that the calls from Keever's husband were received and were in fact welcomed by Gallagher, and that the parties continued to maintain contact, despite Gallagher's promise to Keever that she would leave her husband alone. Gallagher never claimed that Mr. Keever was harassing her or repeatedly calling her after April 1, 2001. There is no evidence in the record that Gallagher asked Keever's husband return the telephone that she had given him for the purpose of contacting her. At trial, Gallagher denied that Keever's husband ever called her during this time period, testimony which the Bankruptcy Court obviously found not to be credible in light of Keever's testimony regarding the call log she observed

on the cell phone.  As the Supreme Court has observed, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson, 470 U.S. at 574, 105 S.Ct. at 1511.

Based upon all of the evidence, the Bankruptcy Court did not err in its determination that Gallagher committed a "willful and malicious injury" to Keever and to Keever's marital relationship by her actions in alienating the affection of Keever's husband.  The evidence supports the Bankruptcy Court's finding that having conducted an adulterous affair with Keever's husband, Gallagher continued to maintain her relationship with Keever's husband, even after being told by Keever that Keever loved her husband and intended to keep her marriage intact.  Gallagher maintained her relationship with Keever's husband, knowing with substantial certainty that harm would result to Keever and her marital relationship, and thus, the portion of the Judgment in the State Court Action which may be apportioned to Keever's claim for alienation of affections constitutes a nondischargeable debt under 11 U.S.C. §523(a)(6).

The proper apportionment of the damages awarded in the State Court Judgment, however, cannot be determined on this record.  The jury

in the State Court Action awarded Keever $50,000 in compensatory damages "for alienation of affections *or* criminal conversation *or both*," as well as $75,000 in punitive damages, which is not attributed to a specific tort claim. [Bky. Doc. 16] (emphasis added). Thus, it is impossible to determine from the face of the State Court Judgment what amount of damages was awarded to Keever solely with regard to the claim for alienation of affections. Accordingly, this case must be remanded to the Bankruptcy Court for further findings on this issue.

On appeal, Gallagher also takes issue with certain findings made by the Bankruptcy Court. Specifically, she argues that the Bankruptcy Court erred "in finding that the 'relationship' between [Gallagher] and Ricky Keever 'progressed to the point' and 'continued', thus creating the impression, by implication or expressly, that the parties were continually engaged in a meretricious relationship...." [Appellant's Brief, Doc. 2 at 4]. Gallagher simply mischaracterizes the Bankruptcy Court's findings. The Bankruptcy Court found that Gallagher and Keever's husband met in 1997 when they began working together and that their working relationship continued until September 2000, when the parties engaged in sexual relations on one occasion. The Bankruptcy Court also found that they

engaged in sexual relations on a second occasion on March 31, 2001. There are no other findings of the "meretricious" nature of the relationship to which Gallagher can assign error. The findings that were actually made are clearly supported by the record, and thus, the Bankruptcy Court's findings in this regard are not clearly erroneous.

Gallagher further argues that the Bankruptcy Court erred in finding that the record of calls on the cell phone discovered by Keever were calls made after the April 1, 2001, meeting and in further finding that this cell phone was used in furtherance of Gallagher's relationship with Keever's husband. [Appellant's Brief, Doc. 2 at 5]. For the reasons discussed *supra*, the Bankruptcy Court's findings on this issue are supported by the record, and therefore, the Court finds Gallagher's argument on this issue to be without merit.

## ORDER

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that the decision of the United States Bankruptcy Court is **AFFIRMED IN PART** and **REVERSED IN PART**. This matter is hereby **REMANDED** for further proceedings, consistent with this opinion.

Signed: June 3, 2008

Martin Reidinger
United States District Judge